## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| JACK NEWBROUGH, Administer of | ) | |
| the Estate of Guido Newbrough, Deceased, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:10CV867–HEH |
| | ) | |
| PIEDMONT REGIONAL JAIL | ) | |
| AUTHORITY, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION
### (Granting in Part and Denying in Part Defendants' Motions to Dismiss, and Denying Plaintiff's Motion to Stay)

This is a civil rights and wrongful death action filed by Jack Newbrough ("Plaintiff"), Administer of the Estate of Guido Newbrough ("Newbrough"), against the Piedmont Regional Jail Authority ("PRJA") and various employees thereof; several unknown U.S. Immigration and Customs Enforcement ("ICE") agents; and the United States of America.  It is presently before the Court on two motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, one filed by Defendants Edward Gordon ("Dr. Gordon"), Joanna Scott ("Scott"), Crystal Wise ("Wise"), Sheletha Johnson ("Johnson"), and Katie Toney ("K. Toney") (collectively, "the Medical Defendants"), and the other filed by the PRJA and its Superintendent, Ernest Toney ("Superintendent Toney").

Also pending before the Court is Plaintiff's Motion to Stay.  Plaintiff asks this Court to stay proceedings as to the United States until October 15, 2011, or until the

Department of Justice releases a report ("the DOJ report") documenting its investigation into medical care at Piedmont, whichever comes first.[1]  In the alternative, Plaintiff requests leave to renew his Motion to Stay if the United States raises any legal issues in preliminary motions that may be affected by the DOJ report.  The United States agrees that discovery should be stayed while preliminary motions are pending, but opposes Plaintiff's request to the extent that it would delay the filing or adjudication of a motion to dismiss.

For the reasons stated below, both of the Motions to Dismiss will be granted in part and denied in part.  The Motion to Stay will be denied.

## I. BACKGROUND

*A.*

Plaintiff's First Amended Complaint contains the factual allegations that follow. As required by Fed. R. Civ. P. 12(b)(6), the Court assumes Plaintiff's well-pleaded allegations to be true, and views all facts in the light most favorable to the Plaintiff. *See Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

On February 19, 2008, Newbrough, a German national, was arrested and ordered to appear before a DOJ immigration judge.  On or about that same day, the unknown Defendant ICE agents ("the ICE Defendants") placed Newbrough in the Piedmont Regional Jail ("Piedmont") to await removal from the United States.[2]  On July 29, 2008,

---

[1] Plaintiff originally sought to stay proceedings as to all parties.  The PRJA, Superintendent Toney, and the United States opposed the motion.  Plaintiff subsequently withdrew the motion with respect to all Defendants except the United States.

[2] ICE sometimes uses local facilities such as Piedmont to house immigrant detainees.

the Immigration Court determined that Newbrough was removable and that he should continue to be detained pending removal.

At Piedmont, Newbrough "developed multiple skin lesions and/or open sores on his scalp." (Pl.'s First Am. Compl. ¶ 34.) These wounds went untreated. In late October 2008, Newbrough "began to experience intense back pain, stomach aches, frequent urination, dizziness and fatigue" (*id.* at ¶ 35)—symptoms that Plaintiff alleges were "consistent with a serious staph infection" (*id.* at ¶ 38). Newbrough complained of his symptoms to Sergeant Malcolm Tillerson ("Sgt. Tillerson") and other unknown correctional officers at Piedmont (together with Sgt. Tillerson, "the Correctional Officer Defendants"). Newbrough "made repeated verbal requests for medical attention, all of which were either ignored or denied." (*Id.* at ¶ 36.)

On October 20, 2008, Kandra Randolph ("Randolph"), a member of Piedmont's medical staff, saw Newbrough for complaints of depression.[3] Randolph's examination indicated that Newbrough's heart rate and blood pressure were "significantly elevated above normal levels." (*Id.* at ¶ 37.) Plaintiff asserts that these symptoms may indicate infection and dehydration, and that "medical intervention is particularly necessary where, as here, a patient . . . also displays lesions on his head." (*Id.*) Dr. Gordon was advised of Newbrough's condition and ordered weekly blood-pressure checks, but "it does not appear that these blood pressure checks were ever conducted during the following four-week period" leading up to Newbrough's death. (*Id.*)

---

[3] Plaintiff alleges that Randolph, Scott, Johnson, K. Toney, Cambridge, and Wise are "nurses, nursing assistants, or medical officers" at Piedmont. (Pl.'s First Am. Compl. ¶ 15.)

Over the following month, Newbrough and several detainees acting on his behalf "submitted multiple written requests [to correctional officers] for medical attention to address Mr. Newbrough's back pain, stomach aches, and frequent urination." (*Id.* at ¶ 38.) The correctional officers "ignored or denied" these requests instead of turning them over to the medical staff as required by "standard policy." (*Id.*) Ultimately, Newbrough was not examined by a doctor, nor clinically tested to determine the cause of his symptoms, nor provided medication to treat his spreading infection. (*Id.*)

Between late October and November 28, 2008, "federal officers from either [the] [Department of Homeland Security ("DHS")] or ICE visited . . . Piedmont . . . once a week to observe conditions at the Jail and address any detainee concerns or complaints." (*Id.* at ¶ 39.) "On at least one occasion, Mr. Newbrough voiced complaints regarding his medical condition and urgent need for medical care to [these] officials." (*Id.*) The officials told Newbrough to submit a written medical request, but took no other action.

"Without medical attention, Mr. Newbrough's symptoms deteriorated and he began to have difficulty" moving, walking, and eating. (*Id.* at ¶¶ 40, 43.) At times, Newbrough "was unable to stand." (*Id.* at ¶ 43.) On multiple occasions, fellow detainees tried to help sooth his pain by placing makeshift ice packs and heat compresses on his back. (*Id.* at ¶¶ 40, 43.) They also took turns delivering meals to Newbrough, and helped him carry his meal tray, as it was "well known among detainees and correctional officers in the unit" that Newbrough was unable to do so on his own. The Correctional Officer Defendants "witnessed and were aware of these events, yet took no action to provide Mr. Newbrough with necessary medical care." (*Id.* at ¶ 43.)

Throughout November 2008, Newbrough complained of severe back pain to the medical staff at Piedmont's "pill call" window. (*Id.* at ¶ 41.) By mid-November, his pain was so excruciating "that he began to sob throughout the night." (*Id.* at ¶ 42.) The sobbing was audible to both fellow detainees and correctional officers in the unit. In late-November, Newbrough's condition continued to deteriorate.

On November 23, 2008, Newbrough was in acute pain, and began pounding on the door of his cell pod and screaming at correctional officers on the other side of a tinted window. (*Id.* at ¶ 44.) Six to eight correctional officers, including Sgt. Tillerson, eventually entered the pod, but "[b]y the time anyone responded, Mr. Newbrough was seated at a table." (*Id.*) Newbrough expressed that "he was in severe pain and needed medical attention." (*Id.*) Instead of providing Newbrough with medical treatment, however, the officers "forced [him] to lie on the ground." (*Id.*) Sgt. Tillerson then dragged Newbrough by his armpits across the floor and out of the pod, as Newbrough "screamed that he was experiencing extreme pain in his back." (*Id.*)

Newbrough was then seen by Wise, a nurse aide. In a Patient Note, Wise observed that Newbrough had trouble standing up and "rolled from left to right, then slowly got up using the wall for assistance." (*Id.* at ¶ 45.) Again, a medical assessment revealed that Newbrough's "blood pressure was significantly elevated and his heart rate was almost double his normal, resting heart rate." (*Id.*) However, "upon receipt of Mr. Newbrough's alarming vital signs, . . . Wise determined that no medical treatment was needed and notified Defendant Gordon." (*Id.*) Dr. Gordon directed that Newbrough be

5

placed in segregation for medical observation, but neither he nor any other licensed physician ever personally examined Newbrough. (*Id.*)

That same day, November 23, Randolph followed up with Newbrough in the medical segregation unit. She noted that Newbrough "was very slow moving off of bunk and coming to cell door. Patient [Mr. Newbrough] walked with his right hand on his back. Patient stated he needed something for the pain becaise [sic] he could not take it anynmore [sic]." (*Id.* at ¶ 47 (alterations in original).) As before, Randolph found that Newbrough's heart rate, blood pressure, and temperature were elevated. Plaintiff asserts that, notwithstanding these indications of infection, medical personnel did not provide any additional clinical testing or treatment at that time. And despite Randolph's findings, Piedmont medical records show that no member of Piedmont's staff followed up on Newbrough's fever. (*Id.*)

The following day, Johnson, another member of Piedmont's medical staff, notified Superintendent Toney that Newbrough was experiencing back pain and severe hypertension. Newbrough was also seen on November 24 by K. Toney, who noted that Newbrough complained "of not being able to sleep, and back pain for 3 days now." (*Id.* at ¶ 51.) At that time, Piedmont notified ICE of Newbrough's medical condition.

It was not until November 25, 2008, only three days before Newbrough died, that Newbrough was given medication to alleviate his pain. (*Id.* at ¶ 38.) At 2:42 p.m., Cambridge, another medical employee, saw Newbrough for complaints of severe lower back pain that radiated into his right hip, neck, and left arm, and occasionally rendered him unable to walk. Dr. Gordon did not personally examine Newbrough, but diagnosed

6

him with "back pain" and prescribed Motrin, an over-the-counter brand of ibuprofen.

Otherwise, Newbrough's condition went untreated.

At around 9:27 that night, Randolph saw Newbrough to measure his vital signs

and provide Motrin. According to a Patient Note, Newbrough stated that he could not get

up because of the severe pain in his back and hip. The Note further reported that "Patient

attempted to sit up and . . . began to turn red in the face. Patient appeared to be in pain."

(*Id.* at ¶ 53.) Dr. Gordon was notified, but advised that no medical treatment was needed.

The following day, K. Toney saw Newbrough and noted that he responded verbally when

called by name, but did not otherwise move.

On November 27, 2008, Scott visited Newbrough in his medical segregation cell.

She advised Newbrough that he needed to get up in order to receive his morning

medication. Newbrough responded that he was unable to walk. According to Scott's

Patient Note, she

> then informed [him] that if he did not get up and walk to the door for his
> medication that he would not get it. Patient then sat up with Assisatnce
> [sic] from Sergeant Davis and said that he could not get up. Patient is
> moving his arms and legs without difficulty. Patient then stood up and sat
> back down stating that he could not walk. I advised patient that he needed
> to walk because if he doesn't this could cause him severe problems . . . . I
> advised patient that I am leaving the pod because he is refusing to get up to
> get his medication he then yelled out to me 'Good bye'. I then came to
> medical and notified Dr. Gordon and per Doc patient is to be housed in
> population. He is nolonger [sic] on medical watch.

(*Id.* at ¶ 55 (alterations in original).)

7

Newbrough was found unresponsive in his cell later that day. He was transported to Southside Regional Hospital, and then by helicopter to the Virginia Commonwealth University Health Systems Hospital ("VCU Hospital"). Plaintiff alleges that:

> Doctors at VCU Hospital determined that Mr. Newbrough had suffered a heart attack caused by bacterial endocarditis, an infection of the heart valves. The infection was well established in Mr. Newbrough's bloodstream and in the valves of his heart. With the infection well established in the bloodstream and valves of the heart, small infectious emboli were ejected from the heart throughout the body's major organs, including the kidneys, brain, intestine, and skin. By the time Mr. Newbrough was being transported to the hospital from Piedmont, his heart had already begun to fail and he was likely suffering from multiple organ failure. Mr. Newbrough died on November 28, 2008 at 1:50 p.m.

(*Id.* at ¶ 57.)

Dr. Homer Venters, who reviewed Newbrough's autopsy, opined that had Newbrough received medical evaluation prior to entering medical segregation on November 23, 2008,

> his potential for dying from his infection would have been greatly reduced. Even if Mr. Newbrough's infection had already spread from a local sight to his bloodstream and heart (unlikely given his ability to converse, ambulate, etc.), time to diagnosis and time to treatment initiation are key variables in endocarditis survival. While native valve endocarditis has a mortality [rate] of 20%–25% with modern medical care, without treatment it is [a] lethal disease.

(*Id.* at ¶ 46 (second alteration in original).)

In light of the foregoing, Plaintiff alleges that:

> Over the course of the five or more weeks that Guido Newbrough complained of severe back pain, stomach aches, frequent urination, and other symptoms, the Defendants:

> (a) . . . failed to provide him with needed examinations by a doctor;

8

(b) . . . failed to provide necessary medical care in a timely manner in response to multiple verbal and written requests for medical attention by and on behalf of Mr. Newbrough;

(c) . . . failed to properly monitor Mr. Newbrough's condition or to ensure proper monitoring by proper health care professionals;

(d) . . . failed to provide for adequate on-site health care on a periodic basis;

(e) . . . failed to conduct basic clinical tests to determine the root cause of Mr. Newbrough's symptoms; and

(f) . . . failed to provide Mr. Newbrough with necessary medication to treat his infection (such as antibiotics) . . . .

(*Id.* at ¶ 58.)

*B.*

Beyond the facts of Newbrough's particular case, the First Amended Complaint describes what Plaintiff terms an "[h]istorical [p]attern of [g]rossly [i]nadequate [m]edical [c]are at Piedmont Regional Jail." (*Id.* at 7.)

Prior to Newbrough's detention, "the pattern of mistreatment of immigration detainees at Piedmont, including the denial of medical care, had been the subject of prominent news articles by national and local news organizations." (*Id.* at ¶ 27.) In particular, "Piedmont received intense scrutiny from the media and ICE officials following the highly publicized death of Abdeulaye Sall ("Sall"), who died at Piedmont in 2006 due to lack of medical treatment." (*Id.*) For example, Plaintiff points to a June 26, 2007 *New York Times* article reporting that Sall "was not given treatment for a serious kidney ailment, even when he was barely able to walk." (*Id.*)

Plaintiff also cites a December 4, 2006 ICE report which disclosed that "[t]he medical health care unit [at Piedmont] does not meet minimum ICE standards," and that Piedmont "ha[d] failed on multiple levels to perform basic supervision and provide for

9

the safety and welfare of ICE detainees." (*Id.* at ¶ 28.) The report further concluded that "[t]he line of communications in the Medical department at [Piedmont] is poor and detainee health care is in jeopardy." (*Id.*)

Also prior to Newbrough's detention, ICE had received several complaints from detainees requesting that the Office of the Inspector General ("OIG") at DHS investigate whether detainees were receiving proper medical care at Piedmont. (*Id.* at ¶ 29.) Plaintiff mentions four such requests made between 2005 and 2007.

On September 4, 2007, the American Bar Association Delegation to Piedmont Detainee Center ("the Delegation") submitted a Report ("the ABA Report") to the Director of ICE's Office of Detention and Removal, which stated that the Delegation had visited Piedmont the month prior and met with its staff, superintendent, and detainees. The ABA Report related a case in which a detainee had submitted four requests for medical care in two months, but had not yet seen a doctor. Moreover, the ABA Report noted the complaints of several detainees concerning long waits for medical care and incomplete responses to their medical requests.

Finally, the DHS Joint Intake Center in Washington, D.C. received information in July 2008 that a Piedmont detainee had submitted thirteen requests for medical attention, all of which were denied.

In light of these reports, Plaintiff contends that at the time ICE Defendants placed Newbrough in Piedmont, they knew or "should have known that Piedmont did not meet ICE standards for a detention facility, that Piedmont was dangerous for immigrant detainees, and that immigrant detainees did not receive adequate medical attention for

their serious medical needs in violation of their constitutional rights." (*Id.* at ¶ 26.) Plaintiff asserts that the ICE Defendants knew of "the facility's routine denial of medical care to immigrant detainees," but "deliberately chose to maintain [Piedmont] in that condition, continued to place immigrant detainees in the facility, and took no steps to improve medical care at the facility." (*Id.* at ¶ 32.)

## C.

Based on the foregoing, Plaintiff's First Amended Complaint asserts eight (8) separate counts against the PRJA, Superintendent Toney, the Medical Defendants, the Correctional Officer Defendants, the ICE Defendants, and the United States of America.[4] Counts One through Four allege liability under 42 U.S.C. § 1983 for violations of Newbrough's rights under the Fourteenth Amendment to the U.S. Constitution. In Count One, Plaintiff claims that the inaction of the PRJA and Superintendent Toney in the face of known widespread deprivations of medical care to detainees constituted "an official custom or policy of deliberate indifference" at Piedmont. (*Id.* at ¶ 61.) Count Two alleges that Superintendent Toney's failure to act despite actual or constructive knowledge that Piedmont personnel were systematically denying adequate health services to detainees, including Newbrough, amounts to supervisory indifference and/or tacit authorization of that constitutionally offensive practice. In Count Three, Plaintiff alleges that Superintendent Toney failed to train Piedmont's correctional and medical officers to treat the serious medical needs of detainees, including Newbrough. In Count Four,

---

[4] Superintendent Toney has been sued in his official and individual capacities in all counts in which he is named as a defendant. The Medical Defendants, the Correctional Officer Defendants, and the ICE Defendants have been sued in their individual capacities only.

Plaintiff claims that the PRJA, Superintendent Toney, the Medical Defendants, and the Correctional Officer Defendants were deliberately indifferent to Newbrough's serious medical needs.

Count Five asserts a state law cause of action under Virginia's wrongful death statute, VA Code Ann. § 8.01-50 (2010), against the PRJA, Superintendent Toney, the Correctional Officer Defendants, and the Medical Defendants.  In Count Six, Plaintiff contends that the ICE Defendants violated Newbrough's Fifth Amendment rights by placing him at Piedmont "with knowledge that Piedmont detainees were routinely denied adequate medical care," systematically denying immigration detainees necessary medical care, and failing to ensure that ICE detainees were adequately screened and monitored for serious medical conditions.  Finally, in Counts Seven and Eight, Plaintiff alleges that the United States is liable under the Federal Tort Claims Act for wrongful death and intentional infliction of emotional distress.

On April 19, 2011, the Medical Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting that Plaintiff failed to state a § 1983 claim against them for deliberate indifference to a serious medical need.[5]  Plaintiff counters that because Newbrough was a civil detainee and not a pretrial detainee, "the 'professional judgment'

---

[5] Initially, the Medical Defendants asserted that Plaintiff's claims against Wise, Johnson, and K. Toney should be dismissed as barred by the statute of limitations. (Defs. Gordon, Scott, Wise, Johnson and Toney's Mem. Supp. Mot. Dismiss 5 [hereinafter Med. Defs.' Mem. Supp.].) They have since withdrawn that argument. (Defs.' Gordon, Scott, Wise, Johnson and Toney's Reply Mem. 2 [hereinafter Med. Defs.' Reply].)  The Medical Defendants do not otherwise challenge the sufficiency of Count Five.

standard, and not the Eighth Amendment deliberate indifference standard," applies. (Pl.'s Opp'n Med. Defs. 9.)

Also pending before the Court is a Motion to Dismiss filed on April 26, 2011, by the PRJA and Superintendent Toney. The PRJA asserts that it is not a "person" subject to suit under 42 U.S.C. § 1983, and that Plaintiff's claims against the PRJA and Superintendent Toney in his official capacity must therefore be dismissed. (Defs. PRJA and Superintendent Toney's Mem. Supp. Mot. Dismiss 4 [hereinafter PRJA Mem. Supp.].) Alternatively, these Defendants argue that because "official-capacity" suits are merely another way of stating a claim against the official's employing agency, Plaintiff's claims against either the PRJA or Superintendent Toney in his official capacity should be dismissed. Finally, the PRJA and Superintendent Toney contend that Counts One through Four should be dismissed for failure to state a claim of municipal liability.[6] (*Id.* at 5–17.) Plaintiff responds that because the PRJA is a municipal entity and not an arm of the State, it is a "person" within the meaning of § 1983.

Both motions to dismiss are ripe for disposition.

## II. STANDARD OF REVIEW

Rule 8 of the Federal Rules of Civil Procedure provides that "a pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Traditionally, "[a] motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. . . . [I]t does not resolve

---

[6] The PRJA and Superintendent Toney do not challenge the sufficiency of Count Five.

contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

*Bell Atlantic Corp. v. Twombly* amplified the standard, noting that, to survive a motion to dismiss, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007). Although Rule 8 does not require "detailed factual allegations," it does demand that a plaintiff provide more than mere labels and conclusions stating that the plaintiff is entitled to relief. *Id.* at 555. As Judge Niemeyer noted in *Francis v. Giacomelli*, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

Thus, a complaint containing facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Twombly*, 550 U.S. at 557 (internal citation omitted). A complaint achieves facial plausibility when it contains sufficient factual allegations to support a reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556; *see also Ashcroft v. Iqbal*, 555 U.S. ___, 129 S. Ct. 1937, 1949 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193.

In short, the Court must assume the plaintiff's well-pleaded factual allegations to be true, and determine whether those allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950.

## III. ANALYSIS

*A.*

To state a claim for relief under § 1983, a plaintiff must allege the violation of a constitutionally protected right by a *person* acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). The PRJA asserts that it is not a "person" within the meaning of that statute.

Whether the PRJA is a "person" under § 1983 depends on whether or not the PRJA is an arm of the State for purposes of Eleventh Amendment immunity. Although Eleventh Amendment immunity and "personhood" under § 1983 are distinct issues, they are analytically tied: both turn on whether a governmental entity is so closely intertwined with the State as to be able to invoke the same protections as the State itself.

It is well settled that "a State is not a person within the meaning of § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989). That exemption from personhood, however, "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Will*, 491 U.S. at 70; *see also Kitchen v. Upshaw*, 286 F.3d 179, 184 (4th Cir. 2002) ("Eleventh Amendment immunity does not extend to mere political subdivisions of a State such as counties or municipalities. However, the amendment does confer sovereign immunity on an arm of the State.") (citations omitted). Indeed, the Supreme Court has made clear that "municipalities and other local governmental units [are] ... among those persons to whom § 1983 applies." *Monell v. Dep't Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). Accordingly, although arms of the State cannot be sued under § 1983, "[l]ocal governing bodies, ...

15

like every other § 1983 'person,' ... may be sued for constitutional deprivations visited

pursuant to governmental 'custom.'" *Id.*

Thus, if the PRJA is an arm of the State such that it shares in the Commonwealth

of Virginia's immunity under the Eleventh Amendment, then it is not a "person"

amenable to suit under § 1983. *Will*, 491 U.S. at 71 ("[N]either a State nor its officials

acting in their official capacities are 'persons' under § 1983."). If it is not an arm of the

State, however, then the PRJA may be subject to liability under § 1983. *See Howlett v.

Rose*, 496 U.S. 356, 377 (1990) ("[§ 1983] makes governmental defendants that are not

arms of the State, such as municipalities, liable for their constitutional violations.").

Although "[t]here is no clear line separating those state instrumentalities that are

entitled to sovereign immunity from those that are not," *Kitchen*, 286 F.3d at 184; *see,

e.g., Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 280 (1977) ("On balance, the

record before us indicates that a local school board is more like a county or city than it is

like an arm of the State."), the Fourth Circuit has held at least one of Virginia's "regional

jails" not to constitute an arm of the State. *Kitchen*, 286 F.3d at 184. As the Court

explained in *Kitchen*, such entities are created by "mere political subdivisions of a State"

that, by themselves, are not entitled to sovereign immunity, and which do not invoke the

Commonwealth's immunity by their mere combination, without more.[7] *Id.* at 185.

Serving six Virginia counties, the PRJA is precisely such a municipal conglomerate.

---

[7] It is immaterial that the regional jail in *Kitchen* was created by a combination of cities and counties, whereas Piedmont was created by counties only. Although such a distinction may be relevant to state law sovereign immunity, *see Mann v. Cnty. Bd. Of Arlington Cnty.*, 98 S.E.2d 515, 518-19 (Va. 1957), federal courts have developed their own body of law as to Eleventh

*Kitchen* set forth a four-factor framework to determine whether a government entity is an arm of the State. First and foremost, the Court must assess "whether a judgment against the [PRJA] would have to be paid from the State's treasury." *Id.* at 184 (quotations and citation omitted). Additionally, the Court must consider "the degree of control that the State exercises over the [PRJA]; ... whether the [PRJA] deals with local rather than statewide concerns; and ... the manner in which State law treats the [PRJA]." *Id.* Applying these factors, this Court finds that the PRJA is not an arm of the State.[8]

First, like the defendant jail authority in *Kitchen*, the PRJA was created pursuant to VA Code Ann. § 53.1-95.7 (2000), which vests the PRJA with the power to sue and be sued in its own name. *Kitchen*, 286 F.3d at 184 ("There is nothing in this section that indicates that a regional authority acts on behalf of the State when it sues or is sued and thus obliges the State to pay any judgment rendered against the authority."). As such, the PRJA—and not the Commonwealth—bears full legal liability, in the first instance, for any violations of law committed by the PRJA. The PRJA contends that because it is insured under the Virginia Constitutional Officer Risk Management plan, any judgment against it will ultimately be paid from the State's treasury. The Fourth Circuit rejected this very argument in *Kitchen*. *See id.* at 184 ("[A]n insurance plan such as this does not suffice to extend the protection of sovereign immunity to ... the Regional Jail Authority."). Critically, "it is the entity's potential legal liability, rather than its ability or

---

Amendment immunity. *See Northern Ins. Co. v. Chatham Cnty.*, 547 U.S. 189, 193-94 (2006) ("[T]his Court has repeatedly refused to extend sovereign immunity to counties.").
[8] *Kitchen* involved a pure Eleventh Amendment immunity analysis. But, because the question whether an entity is a "person" under § 1983 turns on whether it is an arm of the State for purposes of the Eleventh Amendment, the *Kitchen* analysis is directly applicable here.

inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 431 (1997).

Further, Virginia's state law scheme does not treat the PRJA as an arm of the State, but rather vests the PRJA with substantial control over its own operations. The PRJA appoints its own jail officers, agents, and employees, and sets their compensation. VA Code Ann. § 53.1-95.7(3). It also requires the six participating counties to pay, from their respective treasuries, for Piedmont's land, equipment and structures. *Id.* § 53.1-106(B). Further, each participating county's governing body—and not the Commonwealth—appoints the governing body of the PRJA. *Id.* § 53.1-106(A). And although the Commonwealth substantially funds the salaries of Superintendent Toney and the jail's medical personnel, *id.* § 53.1-115, "this fact alone does not forge the close link between the [PRJA] and the State requisite to implicate the State's dignity as a sovereign and thus entitle the [PRJA] to sovereign immunity." *Kitchen*, 286 F.3d at 185.

Finally, Virginia's statutory scheme expressly provides a mechanism by which municipalities may combine to solve local, rather than statewide, jailing problems. Indeed, the PRJA is empowered pursuant to the same state law scheme as the regional jail authority in *Kitchen*, and nothing counsels the Court to reach a different conclusion as to the PRJA. *See id.* ("[T]he retention of substantial authority and control over the construction, governance, and operation of the regional authority, as well as the liability for most of the costs and expenses, tends to establish that the Authority is an arm of the participating local political subdivisions.").

18

Because the PRJA is not an arm of the State for Eleventh Amendment purposes, it cannot claim, under *Monell*, that it does not constitute a "person" within the meaning of § 1983.[9] On the contrary, the PRJA is a "local government unit," and "therefore[] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief." *Monell*, 436 U.S. 658, 690. Accordingly, the PRJA's motion to dismiss Plaintiff's claims against it on the grounds that it is not amenable to suit under § 1983 will be denied.

*B.*

Defendants contend that, given the nature of official-capacity suits, Plaintiff cannot prevail against both the PRJA and Superintendent Toney in his official capacity. They are correct; "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, 436 U.S. 658, 690 n.55 (1978); *see also Brandon v. Holt*, 469 U.S. 464, 471-72 (1985) ("[A] judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents."); *Brissett v. Paul*, No. 97-6898, 1998 WL 195945, at *1 (4th Cir. 1998) ("[N]am[ing] the local governments that employ[] them and naming the local

---

[9] This Court is cognizant of the contrary characterization of the PRJA in *Preval v. Reno*, No. 99-6950, 2000 WL 20591 (4th Cir. Jan. 13, 2000). In an unpublished opinion, the Fourth Circuit adopted the District Court's determination "that the Piedmont Regional Jail is not a 'person' and is therefore not amenable to suit under § 1983." *Id.* at *1; *see also Preval v. Reno*, 57 F. Supp. 2d 307, 310 (E.D. Va. 1999) (stating, without discussion, that "the Piedmont Regional Jail is not a 'person' ... under 42 U.S.C. §1983"). Both the District Court and Fourth Circuit in *Preval* cited *Will* in support of their conclusion. In this Court's view, however, *Preval* cannot be reconciled with the Fourth Circuit's more recent analysis in *Kitchen*, which held that a regional jail did *not* share in the Commonwealth's Eleventh Amendment immunity. Because *Will* holds that an entity which does not constitute an arm of the State for purposes of Eleventh Amendment immunity is a "person" subject to suit under § 1983, this Court interprets *Kitchen* to overrule the inconsistent portions of *Preval*. Moreover, as the Fourth Circuit treats its unpublished opinions as non-precedential, 4th Cir. R. 32.1, this Court does not view *Preval* as binding in deciding whether the PRJA is a "person" under § 1983.

officials in their official capacities [is] ... redundant and unnecessary."). Plaintiff's

official-capacity claims against Superintendent Toney *are* claims against the PRJA.

Consequently, Plaintiff's official-capacity claims will be dismissed in all Counts in which

the PRJA is also named as a defendant. Defendants' Motion to Dismiss will be granted

as to Superintendent Toney in his official capacity in Count One and Count Four.

### C.

*1. The Deliberate Indifference Standard Applies to the Instant Case*

The failure of a jail to provide a detainee with adequate medical care may

constitute a deprivation of the detainee's constitutionally protected rights, and thus give

rise to a cause of action under § 1983. Because Newbrough was not a convicted prisoner

at the time of the events in question, but rather an alien detainee, Plaintiff's claims are

governed by the Due Process Clause of the Fourteenth Amendment instead of the Eighth

Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243-44 (1983); *Bell

v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). As an initial matter, however, the parties in

this case disagree as to the burden Plaintiff must carry to establish a plausible § 1983 due

process claim based on deprivation of medical care.

Because Newbrough was not charged with a crime at the time of his detention,

Plaintiff argues that the appropriate standard to evaluate Defendants' conduct is not the

"deliberate indifference" standard applicable to pre-trial detainees, but rather the more

lenient "professional judgment" standard articulated in *Youngberg v. Romero*, 457 U.S.

307 (1982). In *Youngberg*, the Supreme Court held that state officials could be held

liable for denying proper care to an involuntarily committed, intellectually disabled

individual upon a showing of a "substantial departure from accepted professional judgment, practice, or standards." 457 U.S. at 323. More recently, the Fourth Circuit applied the professional judgment standard to an involuntarily committed psychiatric patient's denial-of-medical-care claim. *See Patten v. Nichols, MD*, 274 F.3d 829, 835 (4th Cir. 2001). Defendants contend that Plaintiff's claims should be subject to the deliberate indifference standard. Neither party has identified a Fourth Circuit case squarely establishing the appropriate standard to apply to such claims by alien detainees.

The Supreme Court's analysis in *Youngberg* makes clear that the purpose of the detention dictates the proper standard for assessing a detainee's denial-of-medical-care claim. In that case, for instance, the patient's commitment was intended "to provide reasonable care and safety." *Youngberg*, 457 U.S. at 320 n.27. For that reason, the plaintiff was "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321-22. In short, *Youngberg* indicated that differently situated detainees are entitled to different standards of care from their custodians.

In *Patten*, the Fourth Circuit employed *Youngberg*'s rationale and found "sufficient differences between pre-trial detainees and involuntarily committed psychiatric patients to justify" applying different standards to each—namely, the deliberate indifference and professional judgment standards, respectively. *Patten*, 274 F.3d at 840. In particular, the Court examined (1) the purpose of the confinement; (2) the nature of the facility in which the individual was confined; and (3) the duration of confinement. *See id.* at 840-41. As to the first factor, the Fourth Circuit observed that

21

whereas psychiatric patients are confined for purposes of "treatment," pretrial detainees are confined "because the state believes the detainee has committed a crime, and ... to ensure that he appears for trial and serves any sentence that might ultimately be imposed." *Id.* at 841. Second, whereas pretrial detainees are confined in jails or prisons staffed by law enforcement officials, involuntarily committed patients generally are housed in hospitals staffed by medical professionals. *Id.* Finally, while patients may be confined for "lengthy and even lifelong" periods, pretrial detainees are confined for "a relatively short period of time." *Id.* These distinctions warranted differential treatment.

Applying *Patten*'s analytical framework to the case at hand, this Court finds that immigration detainees are more similarly situated to pretrial detainees than to involuntarily committed patients, such that the stricter deliberate indifference standard should apply.[10] First, the Court assesses "the reason for which the person has been taken into custody." *Id.* On close review, there is substantial similarity between the justifications for pretrial detention of the criminally accused and for detention of removable aliens. Most notably, both forms of detention serve to secure the detainee's appearance at future proceedings, and to protect the community. *See Zadvydas v. Davis,* 533 U.S. 678, 690 (2001) (stating that the detention of removable aliens serves to "ensur[e] the appearance of aliens at future immigration proceedings" and to "prevent[] danger to the community"). The statutory authorizations for each are markedly similar.

---

[10] The PRJA and Superintendent Toney note that Plaintiff's First Amended Complaint did not assert the professional judgment standard, but made reference only to the deliberate indifference standard. Because the Court declines to apply the professional judgment standard in any event, it need not consider Defendants' waiver argument.

*Compare* 8 U.S.C. § 1231(a)(6) ("An alien ordered removed who ... has been determined ... to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period"), *and* 8 C.F.R. § 241.3 (listing alien's flight risk and potential threat to the community as factors warranting detention), *with* 18 U.S.C. § 3142(e) (permitting pretrial criminal detention if necessary to ensure the defendant's appearance or to protect the community).

Additionally, the Court considers the physical and durational nature of the confinement. Like pretrial detainees, immigration detainees generally are housed in jails while awaiting removal. And like pretrial detention, pre-removal detention is generally limited in duration, whereas patients are often committed for longer periods of time. Indeed, immigration detainees are ordinarily detained for only ninety days, or until removed, unless circumstances warrant longer confinement. *See* 8 U.S.C. § 1231(a)(2).

The *Fourth Circuit* found ample *differences* between pretrial detainees and involuntarily committed patients to warrant distinct legal standards. *Patten*, 274 F.3d at 841 ("[I]t can hardly be said that the groups are similarly situated."). By the same token, this Court finds that pretrial and alien detainees share sufficient *similarities* to justify assessing their denial-of-medical-care claims under the same standard. Accordingly, this Court evaluates Plaintiff's allegations under the deliberate indifference standard.

*2. Overview of § 1983 Denial-of-Medical-Care Claims*

Pretrial detainees enjoy at least the same protections under the Fourteenth Amendment as convicted inmates have under the Eighth Amendment. *See City of Revere,* 463 U.S. at 244. Consequently, pretrial detainees have a "clearly established"

right "to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs." *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) (citation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

A plausible § 1983 denial-of-medical-care claim consists of two elements. First, a plaintiff must allege an objectively "serious medical condition." *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). Second, a plaintiff must allege that the defendants "acted with a sufficiently culpable state of mind." *Id.* This subjective component "entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Neither party in this case disputes that Newbrough suffered from a serious medical condition—namely, a bacterial staph infection that resulted in endocarditis and death. So, the dispositive issue in evaluating Plaintiff's claims is the extent of each Defendant's alleged deliberate indifference toward Newbrough's medical needs.

Deliberate indifference is "a very high standard—a showing of mere negligence will not meet it." *Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001). To carry its burden, a plaintiff must show that the defendants were "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they] dr[ew] the inference." *Farmer*, 511 U.S. at 837. In other words, "[a]ctual knowledge or awareness on the part of the [jail official] is essential to proof of deliberate indifference." *Brice v. Va. Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995).

For that reason, a jail official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844.

*D.*

Plaintiff asserts two general categories of deliberate indifference claims under § 1983. In Count Four, Plaintiff alleges what one court termed "episodic-acts" of deliberate indifference. *Duvall v. Dallas Cnty. Tex.*, 631 F.3d 203, 210 (5th Cir. 2011). To state a claim under this theory, Plaintiff must show *subjective* deliberate indifference on the part of the *particular* municipal employees who committed the various acts alleged. *Id.* If proven, this "underlying" deprivation of Newbrough's rights may form the basis for constitutional violations asserted in Counts One through Three. In these first three Counts, Plaintiff relies upon the "municipal-liability 'custom or policy'" and "supervisory liability" theories to hold liable those entities or authorities whose pattern of disregard allegedly *caused* the underlying violation. Specifically, in addition to asserting § 1983 claims against the individual Piedmont medical and correctional officers who interacted with and allegedly injured Newbrough directly, Plaintiff seeks to impose derivative liability on the PRJA and Superintendent Toney.

*1. Plaintiff's Episodic-Acts Claims – Count Four*

Because municipal and supervisory liability require a threshold finding of some underlying constitutional deprivation, the Court first determines whether Plaintiff has

stated a plausible claim against any individually named Defendants. [11] Both Motions to Dismiss argue that the First Amended Complaint lacks sufficient factual allegations to satisfy both the objective and subjective elements of the "deliberate indifference" alleged in Count Four.

Deliberate indifference "can be manifested ... by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Smith v. Smith*, 589 F.3d 736, 738-39 (4th Cir. 2009) (quoting *Estelle*, 429 U.S. at 104-05). However, a mere "error of judgment" or "inadvertent failure to provide adequate medical care ... will not constitute a constitutional deprivation redressable under § 1983." *Boyce v. Alizaduh*, 595 F.2d 948, 953 (4th Cir. 1979). Accordingly, to state a plausible claim, Plaintiff must allege that a Defendant deliberately denied, delayed, or interfered with Newbrough's medical care with knowledge of Newbrough's grave condition.

### a. Joanna Scott

Plaintiff has stated a plausible claim of deliberate indifference against Defendant Scott. The First Amended Complaint alleges that Scott visited Newbrough only hours before he was found unresponsive in his medical isolation cell. (Pl.'s First Am. Compl. ¶ 55.) Newbrough had been placed in a distinct unit of the jail for purposes of medical observation. Notes from Scott's examination indicate that she refused to administer Newbrough's prescribed pain medication "if [Newbrough] did not get up and walk to the

---

[11] Since Defendants Cambridge, Randolph, and Tillerson have not filed any motion to dismiss, the Court does not assess the sufficiency of Plaintiff's § 1983 claims as to these parties. The Court entered default against Randolph and Tillerson on June 3, 2011 (Dk. No. 37).

door." (*Id.*) In fact, even after Scott readily acknowledged that not taking his medication "could cause [Newbrough] severe problems" (*id.*), she withheld treatment. When Newbrough expressed that he could neither stand nor walk, Scott "advised [Newbrough] that [she was] leaving the pod because he [was] refusing to get up to get his medication." (*Id.*) As a result, Newbrough did not receive his medication. Scott then reported her observations and course of action to Dr. Gordon.

It is unclear whether Scott was fully aware of the gravity of Newbrough's ailment. It is reasonable to infer, however, that Newbrough's isolation in a medical segregation unit and apparent inability to walk or stand made Scott subjectively aware of his acute condition. Moreover, Plaintiff's allegations support the inference that Scott knowingly disregarded Newbrough's medical needs. Because consciously withholding medical care can give rise to a plausible claim of deliberate indifference, *see Smith*, 589 F.3d at 738-39 (stating that "intentionally *denying* or delaying access to medical care or intentionally interfering with the treatment once prescribed" amounts to deliberate indifference), the Motion as to Plaintiff's § 1983 claim against Defendant Scott will be denied.

### b. Sheletha Johnson

Plaintiff has failed to state a plausible § 1983 claim against Defendant Johnson. Even assuming that all of Plaintiff's general allegations against "Defendants" (Pl.'s First Am. Compl. ¶ 33), "Medical Defendants" (*id.* at ¶ 36), and "medical staff" (*id.* at ¶ 38) are attributable to Johnson, the facts are not sufficient to establish that she was deliberately indifferent. That is, taking as true that Newbrough "began to complain to the ... Medical Defendants ...of severe back pain, stomach aches, frequent urination, and

fatigue" (*id.* at ¶ 36), there is little in the First Amended Complaint to suggest that Johnson actually knew of Newbrough's serious medical needs. Indeed, Plaintiff's sole allegation concerning Johnson personally is that she "notified ... Superintendent Toney that Mr. Newbrough was experiencing back pain and severe hypertension." (*Id.* at ¶ 36.) Unlike some of her fellow medical staff members, Johnson did not take Newbrough's vital signs, and did not regularly—or even twice—assess Newbrough's condition.

Moreover, Johnson's actions do not appear unreasonable. Even if Defendant Johnson was subjectively aware of Newbrough's grave circumstances, her conduct in reporting Newbrough's condition to Piedmont's highest authority does not reflect total indifference to Newbrough's medical needs. Because these minimal allegations fail to "nudge" Plaintiff's § 1983 claim against Defendant Johnson "across the line from conceivable to plausible," that claim "must be dismissed." *Twombly*, 550 U.S. at 570.

### c. K. Toney

Plaintiff has also failed to state a plausible claim under § 1983 against Defendant K. Toney. The First Amended Complaint alleges that Defendant K. Toney saw Newbrough twice. On November 24, 2008, Newbrough expressed to K. Toney that his acute back pain had kept him from sleeping for three consecutive nights. On November 26, K. Toney attempted several times to call Newbrough by name, but Newbrough responded only verbally. In both instances, K. Toney documented her observations in a Patient Note. (Pl.'s First Am. Compl. ¶¶ 51, 54.) Plaintiff further alleges that "Newbrough was not examined by a doctor or provided with other necessary medical assistance at this time." (*Id.*)

The fact that K. Toney expressly noted Newbrough's severe pain, sleeplessness, and unresponsiveness fairly supports an inference that she understood the gravity of Newbrough's condition. Plaintiff has not sufficiently alleged, however, that K. Toney deliberately disregarded that condition. The Supreme Court has explained that "[p]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they respond[] reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Viewed in context, K. Toney's actions were reasonable: she timely and accurately documented her observations and related them to superior Piedmont officials, including Dr. Gordon.

Because there is no indication that K. Toney denied, delayed, or intentionally interfered with Newbrough's treatment, these facts alone do not support a "right to relief above the speculative level." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com*, 591 F.3d 250, 255 (4th Cir. 2009). Therefore, the Court will dismiss Plaintiff's § 1983 claim against Defendant K. Toney.

### d. Crystal Wise

The First Amended Complaint further fails to state a plausible claim of deliberate indifference as to Defendant Wise. Plaintiff alleges that Wise, a nurse aide, saw Newbrough on November 23, 2008. During that visit, Newbrough complained of "severe back pain" and had trouble standing. (Pl.'s First Am. Compl. ¶ 45.) Further, Newbrough's vital signs indicated a significantly elevated heart rate, as well as unusually high blood pressure. Wise reported these observations to her superior, Dr. Gordon, who relied upon Wise's report in ordering that Newbrough be placed in medical segregation

29

for further observation. (*Id.*) Standing alone, these facts do not indicate that Wise was aware of the seriousness of Newbrough's medical condition.

Arguably, a prudent medical aide in Wise's possession would have more thoroughly assessed Newbrough's elevated vital signs and complaints of pain. Still, such a lapse in professional judgment does not amount to deliberate indifference. *See Farmer*, 511 U.S. at 844 (stating that a prison official was not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial of nonexistent"). As alleged, Wise's conduct was not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). On the contrary, that Wise's report to Dr. Gordon resulted in Newbrough being put on medical watch suggests a measure of reasonableness. Accordingly, Plaintiff has failed to state a plausible claim of deliberate indifference as to Defendant Wise, and the Motion to Dismiss will be granted as to Plaintiff's § 1983 claim against her.

    *e. Edward Gordon, MD*

Plaintiff alleges that Defendant Dr. Gordon is a trained physician who supervises the provision of medical care to detainees at Piedmont. (Pl.'s First Am. Compl. ¶ 16.) Principal among his responsibilities is receiving reports from subordinate Piedmont medical staff and prescribing treatment accordingly. Having alleged repeated instances of inaction or mere perfunctory treatment by Dr. Gordon, as well as several failures to follow up on prescribed courses of treatment, Plaintiff has pleaded a plausible claim of deliberate indifference as to Dr. Gordon.

Although Dr. Gordon may ultimately prove that this was merely a tragic case of misdiagnosis, the cursory level of his treatment in the face of Newbrough's repeated complaints of severe pain, reports from medical staff indicating that Newbrough had a significantly elevated heart rate and blood pressure and suffered from stomach aches, frequent urination, and dizziness, and Newbrough's visible physical deterioration—including sores and an inability to walk or stand—is sufficient to support an inference that he acted with "deliberate indifference to a substantial risk of serious harm." *Farmer*, 511 U.S. at 836; *see Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir.1989) ("When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.").

Moreover, the Fourth Circuit has held that a medical official's failure to follow up on a prescribed course of treatment presents a plausible claim of deliberate indifference. *See Miltier*, 896 F.2d at 853 (denying the defendant's motion for summary judgment where a jail's chief doctor, after approving a recommendation for referral to a hospital, "did nothing to follow up" despite the detainee's "continued complaints"). Plaintiff's allegations concerning Dr. Gordon portray a pattern of disregard. First, on October 20, 2008, Dr. Gordon learned that Newbrough's heart rate and blood pressure were both "significantly elevated above normal levels." (Pl.'s First Am. Compl. ¶ 37.) Such symptoms can be indicative of serious infection. In response, Dr. Gordon ordered weekly blood pressure checks, but never ensured that they were administered. Consequently, his order went unfulfilled.

31

Again, on November 23, upon receiving a report of Newbrough's "severe back pains" and elevated vital signs, Dr. Gordon placed Newbrough in medical segregation, but made no effort to assess Newbrough personally. (*Id.* at ¶ 45.) Ultimately, despite Newbrough's worsening condition, Dr. Gordon prescribed a medical regimen consisting only of monitoring and Motrin. And notably, only hours before Newbrough was found unresponsive in his cell, Dr. Gordon ordered that Newbrough be taken *off* of medical watch. (*Id.* at ¶ 55-56.)

Importantly, Dr. Gordon cannot insulate himself from liability by claiming that he was merely ignorant of Newbrough's underlying medical problems. The Fourth Circuit has made clear that

> even a [prison official] able to prove that he was in fact oblivious to an obvious injury of sufficient seriousness may not escape liability if it is shown, for example, that he merely refused to verify 'underlying facts that he strongly suspected to be true,' which, if verified, would have compelled him to realize that the claimant needed immediate medical attention, or that he 'declined to confirm inferences of risk that he strongly suspected to exist.'

*Brice*, 58 F.3d at 105 (quoting *Farmer*, 511 U.S. at 843 n.8). In the month leading up to Newbrough's death, Dr. Gordon received repeated reports concerning Newbrough's condition, and his order that Newbrough be placed in medical isolation suggests he was at least cognizant of Newbrough's ailment—even if willfully unaware of its full extent. Indeed, Dr. Gordon's alleged direction that ICE be contacted "to inform them of [Newbrough's] complaints and status" permits a reasonable inference that Gordon did, in fact, understand the severity of the situation. (Pl.'s First Am. Compl. ¶ 49.) And yet, Plaintiff alleges, Dr. Gordon never personally examined Newbrough. This fact alone

suggests that Dr. Gordon consciously "declined to confirm inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8.

Because these facts plausibly indicate that Dr. Gordon failed to provide meaningful medical care despite being aware of the seriousness of Newbrough's condition, Plaintiff has sufficiently stated a claim of deliberate indifference against him. Accordingly, the Motion to Dismiss will be denied as to Plaintiff's § 1983 claim against Dr. Gordon.

*f. Plaintiff's Allegations of Direct "Episodic-Acts" of Deliberate Indifference by the PRJA and Superintendent Toney*

In addition to the above Defendants, Count Four seeks to hold the PRJA and Superintendent Toney directly liable under § 1983 for acting with deliberate indifference to Newbrough's serious medical needs. Specifically, Count Four asserts that these Defendants were subjectively aware of Newbrough's "continuous and prolonged manifestations of extreme physical pain and discomfort," yet "failed to provide [Newbrough] with appropriate medical care." (Pl.'s First Am. Compl. ¶ 74). Whereas Counts One through Three allege that the PRJA and Superintendent Toney caused their *subordinates* at Piedmont to commit an underlying constitutional violation, Count Four alleges that these Defendants *personally* denied medical care to Newbrough. Such a claim is misguided.

First, Plaintiff has not alleged facts which plausibly suggest that the PRJA—an inanimate municipal entity—was subjectively "aware" of Newbrough's medical needs, much less that it consciously disregarded those needs. Certainly, the PRJA may be liable

for maintaining a municipal custom of constitutionally deficient medical care that caused Newbrough's injury. *See Bd. of Cnty. Com'rs v. Brown*, 520 U.S. 397, 403-04 (1997). And indeed, Plaintiff asserts such a claim in Count One, discussed below. But, even if the PRJA may be liable for causing Piedmont employees to withhold medical treatment from detainees, it plainly did not, and could not, act with the sort of direct, episodic, and subjective disregard towards Newbrough that Plaintiff alleges in Count Four.

Likewise, Plaintiff has not sufficiently alleged that Superintendent Toney was personally aware of the seriousness of Newbrough's circumstances to support a denial-of-medical-care claim. To assert a plausible claim of deliberate indifference, it is "essential" to show "[a]ctual knowledge or awareness on the part of the alleged inflicter." *Brice*, 58 F.3d at 105. In this case, Plaintiff makes only one specific allegation concerning Superintendent Toney's actual knowledge of Newbrough's condition: that on November 24, 2008, "Defendant Johnson notified Defendant Superintendent Toney that Mr. Newbrough was experiencing back pain and severe hypertension." (Pl.'s First Am. Compl. ¶ 74.) The First Amended Complaint does not allege that Superintendent Toney had any medical training which might have enabled him to deduce from that single report the seriousness of Newbrough's ailment. Standing alone, therefore, this fact does not support a reasonable inference that Superintendent Toney was subjectively aware of Newbrough's serious medical needs. Rather, the facts alleged suggest that Superintendent Toney delegated sole responsibility for the routine care of detainees to subordinates such as Dr. Gordon and the Medical Defendants.

Of course, Superintendent Toney may nonetheless be liable under § 1983 if he authorized, directed, or otherwise caused his subordinates to inflict Newbrough's constitutional injury. Plaintiff asserts precisely such supervisory-liability and official-policy-or-custom claims in Counts One through Three. As to Count Four, however, Plaintiff has failed to allege that Superintendent Toney "had the requisite knowledge of a substantial risk" to Newbrough's health, *Brice*, 58 F.3d at 105 (quoting *Farmer*, 511 U.S. at 842), to hold him directly liable for denying medical care to Newbrough.

Because Plaintiff has failed to allege a plausible "episodic-acts" claim against the PRJA and Superintendent Toney, Count Four will be dismissed as to those Defendants.

2. *Plaintiff's Derivative Claims – Counts One through Three*

Having concluded that the First Amended Complaint states plausible claims of deliberate indifference against at least some of the individual Defendants named in Count Four, the Court now considers Plaintiff's claims against the PRJA and Superintendent Toney in Counts One, Two, and Three.[12]

a. *Denial of Medical Care Pursuant to Official Policy or Custom*

The PRJA and Superintendent Toney move the Court to dismiss Count One on the grounds that Plaintiff failed to allege facts evidencing an "official policy or custom" of deliberate indifference toward the medical needs of inmates and detainees. They also

---

[12] Importantly, a municipal entity "necessarily is not liable for any alleged injuries" if "no [underlying] constitutional violation occurred." *S.P. v. City of Takoma Park*, 134 F.3d 260, 274 (4th Cir. 1998).

argue that Count Three should be dismissed for Plaintiff's failure to identify any actual deficiency in training directly linked to a constitutional violation by a Piedmont actor.

A municipal entity is not automatically liable under § 1983 for the constitutional infractions of its employees. *Brown*, 520 U.S. at 403-04 ("We have consistently refused to hold municipalities liable under a theory of respondeat superior."); *Monell*, 436 U.S. at 691 (stating that a municipal body "cannot be held liable solely because it employs a tortfeasor"). However, municipal entities "may be sued [under §1983] for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690. In this case, therefore, Plaintiff's claim against the PRJA in Count One will not be dismissed if it plausibly alleges (1) the existence of an official policy or custom (2) that is fairly attributable to the PRJA and (3) that proximately caused the underlying violation of Newbrough's rights under the Fourteenth Amendment. *See Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

In the same way, supervisory officials are not vicariously liable for constitutional injuries inflicted by their subordinates. *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). But, supervisory officials may be liable if their "edicts or acts may fairly be said to represent official policy," *Monell*, 436 U.S. at 694, and if they have promulgated a custom or policy that caused a constitutional violation. Thus, Plaintiff's Count One claim against Superintendent Toney will not be dismissed if it plausibly alleges (1) that Superintendent Toney's edicts or acts represent official policy, and (2) that he actively

36

maintained a policy of deliberate indifference to the medical needs of detainees, (3)

pursuant to which a Piedmont employee violated Newbrough's constitutional rights.

As an initial matter, the Court notes that Plaintiff has asserted separate failure-to-

train and policy-or-custom claims, in Counts Three and One, respectively. Both the

Supreme Court and Fourth Circuit, however, have treated the former as a subcategory of

the latter. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("[W]here a

municipality's *failure to train* its employees in a relevant respect evidences a 'deliberate

indifference' to the rights of its inhabitants ... such a shortcoming [can] be properly

thought of as a city *'policy or custom'* that is actionable under § 1983.") (emphasis

added); *see also Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). That is, inadequate

training of Piedmont employees may itself constitute a policy of deliberate indifference to

detainees' medical needs. Thus, the Court views Plaintiff's standalone failure-to-train

claim in Count Three to be duplicative of the policy-or-custom claim in Count One.

Taking Plaintiff's allegations in Count Three as forming, in part, the basis for Count One,

the Court will dismiss Count Three as a distinct claim.

A plaintiff may identify an official policy in three ways: (1) in written ordinances

and regulations; (2) in certain affirmative decisions of policymaking officials; or (3) in

certain omissions on the part of policymaking officials that manifest deliberate

indifference to the rights of citizens. *Carter*, 164 F.3d at 218 (internal citations omitted).

Moreover, "[o]utside of such formal decisionmaking channels, a municipal custom may

arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as

to constitute a 'custom or usage' with the force of law.'" *Id.* Plaintiff has not alleged that

a formal rule or some policymaker's affirmative decision caused the constitutional deprivation at issue. The relevant inquiry, then, is whether the inaction of policymaking officials at Piedmont—in particular, Superintendent Toney—manifested deliberate indifference to the rights of detainees, or whether there existed at Piedmont a persistent and widespread practice of deliberate indifference to the medical needs of detainees sufficient to constitute an official custom. As to both of these inquiries, the facts set forth in the First Amended Complaint permit the Court to answer affirmatively.

### i. Piedmont's Policy of Inadequate Training

First, Plaintiff has alleged facts that support a reasonable inference that Superintendent Toney, as Piedmont's policymaker, so grossly failed to train personnel as to exhibit deliberate indifference to the rights of detainees. In *City of Canton*, the Supreme Court held that a municipal entity may have an actionable "policy of not taking reasonable steps to train its employees" if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390. In its First Amended Pleading, Plaintiff identifies an apparent pattern of deficient medical care at Piedmont, evidenced both by the particular events surrounding Newbrough's death and by separate instances of alleged mistreatment of other detainees.

To avoid dismissal under 12(b)(6), Plaintiff need not identify in detail the exact training policies in effect, or lack thereof, at the time of the events in question. Thus,

Defendants' contention that "the Amended Complaint is completely silent as to the identity of the deficient training" is premature. (PRJA Mem. Supp. at 7.) Rather, it is sufficient that Plaintiff has alleged that Piedmont correctional officers regularly refused to refer requests for medical attention unless in writing, notwithstanding the urgency of the detainee's need (Pl.'s First Am. Compl. ¶ 38); that various members of Piedmont's staff either failed to recognize symptoms of grave illness, or otherwise ignored them (*id.* at ¶¶ 36, 40, 42); and that, even in the face of a potentially fatal infection, medical personnel at the jail provided no more than an over-the-counter pain reliever (*id.* at ¶ 38). Such facts reveal an "obvious" need for improved personnel training at Piedmont. And because substantially untrained medical officers are likely to render constitutionally deficient care, Superintendent Toney's failure to ensure proper training may reflect deliberate indifference to the rights of detainees.

### ii. Piedmont's Custom of Deliberate Indifference

Second, Plaintiff has alleged facts supporting a reasonable inference that there existed at Piedmont a practice of deliberate indifference to detainee medical needs that was so persistent, widespread, and well-settled as to constitute official custom. Importantly, Defendants are correct that an "[i]solated, unprecedented incident[]" of medical deprivation is insufficient to prove a custom of deliberate indifference. *See Doe v. Broderick*, 225 F.3d 440, 456. Further, Plaintiff "cannot rely upon scattershot accusations of unrelated constitutional violations to prove either that a municipality was indifferent to the risk of [Newbrough's] specific injury or that it was the moving force behind [the] deprivation." *Carter*, 164 F.3d at 218; *see also id.* at 220 (explaining that a

"meager history of isolated incidents" does not establish a municipal custom). In this case, however, Plaintiff has provided ample substantiation.

The First Amended Complaint identifies numerous alleged denials of medical care at Piedmont, all within the three years preceding Newbrough's death. (Pl.'s First Am. Compl. ¶¶ 27-31.) Specifically, Plaintiff points to a 2007 *New York Times* article concerning the death of another Piedmont inmate (*id.* at ¶ 27), a 2006 ICE report stating that Piedmont "ha[d] failed on multiple levels to perform basic supervision and provide for the safety and welfare of ICE detainees" (*id.* at ¶ 28), complaints from various Piedmont detainees in 2005-07 asserting that their requests for medical attention were ignored (*id.* at ¶ 29), a 2007 ABA report noting unresponsiveness to Piedmont detainees' medical needs (*id.* at ¶ 30), and a detainee complaint filed with the Department of Health Services in 2008 alleging thirteen denied requests for medication (*id.* at ¶ 31). Taking these reports as true, the Court cannot conclude that Plaintiff has failed to allege a persistent and widespread practice of deficient medical care at Piedmont.[13]

Rather than exceptional, Newbrough's alleged mistreatment appears consistent with an historic and highly disconcerting pattern of neglect at Piedmont. Having plausibly alleged "continued inaction [by the PRJA and Superintendent Toney] in the face of a known history of widespread constitutional deprivations," *Milligan v. City of Newport News*, 743 F.2d 227, 229-30 (4th Cir. 1984), Plaintiff's First Amended

---

[13] Plaintiff's case is distinct from those such as *Carter*, in which the Fourth Circuit did not find the "'widespread and permanent' practice necessary to establish municipal custom" because the plaintiff "ha[d] shown no relevant incident prior to her own case of which the City could have had knowledge and in which it acquiesced." *Carter*, 164 F.3d at 220.

Complaint sufficiently delineates a custom of deliberate indifference. Defendants may later prove otherwise, but their characterization of Newbrough's death as an isolated incident is unpersuasive at this stage.

### iii.  *Official Policy or Custom as a Proximate Cause of the Harm*

It is not enough to identify a policy or custom of deliberate indifference; Plaintiff must also allege that the policy or custom proximately caused the instant constitutional injury. *Monell*, 436 U.S. at 658; *Carter*, 164 F.3d at 218 (requiring "a close fit between the unconstitutional policy and the constitutional violation"). The First Amended Complaint alleges that the denial of medical care at Piedmont "did in fact cause, or contribute to the cause of, Guido Newbrough's death," and that Superintendent Toney's "failure to train his staff ... ultimately resulted in Guido Newbrough's death." (Pl.'s First Am. Compl. ¶¶ 62, 70.) Although the Court need not accept as true these "conclusory allegations regarding the legal effect of the facts alleged," *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995), there is a logical and natural connection between a policy or custom of deficient medical care and an instance of inadequate medical care.

Further, Plaintiff has set forth the statement of Dr. Homer Venters, who, upon reviewing Newbrough's autopsy, reported that "had Mr. Newbrough received medical evaluation [prior to entering medical segregation], his potential for dying from his infection would have been greatly reduced." (Pl.'s First Am. Compl. ¶ 46.) That is, but for the failure of Piedmont personnel to tender adequate medical assessment and treatment upon recognizing Newbrough's serious medical condition, Newbrough likely would have recovered from his illness. According Plaintiff all reasonable inferences,

41

then, the First Amended Complaint alleges a direct nexus between Piedmont's policy or custom of deliberate indifference to detainees' medical needs and Newbrough's death.

### iv. Superintendent Toney is a PRJA Policymaker

The deliberate indifference of a "policymaker" may render liable both the official, in his individual capacity, and the municipal entity. Thus, to attribute Superintendent Toney's acts to the PRJA and impose liability on both, Plaintiff must plausibly allege that Superintendent Toney is a "policymaker" for purposes of § 1983. That is, Plaintiff must plead facts from which the Court reasonably can infer that Superintendent Toney's "edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. The law in the Fourth Circuit is laid out thoroughly in *Spell v. McDaniel*, 824 F.2d 1380, 1385-86 (4th Cir. 1987).

In *Spell*, the Fourth Circuit upheld a jury's imposition of municipal liability after concluding that the defendant police chief "was an authorized policymaker" for the city in law enforcement matters. 824 F.2d at 1395. The Court explained that "'policymaking authority' implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." *Id.* at 1386 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 1299-1300 & n.12 (1986)). The Court went on to state that

> the most critical factor is not the practical finality of an official's "acts and edicts," but their "policy" nature. On the other hand, a municipal agency or official may have final authority to make and implement policy despite a municipality's retention of powers of ultimate control over both policy and policymaker. The question is one of authority-in-fact. A municipal governing body may not avoid attribution of policy to itself simply by officially retaining unexercised ultimate authority to countermand a policy or to discipline or discharge the policymaker.

42

Applying the principles set forth in *Spell*, this Court finds that the facts alleged

satisfactorily depict Superintendent Toney as a policymaker for purposes of § 1983.

Defendants do not contend otherwise. Specifically, the First Amended Complaint asserts

that Superintendent Toney was Piedmont's chief administrator, and that his

responsibilities included hiring, training, and supervision of personnel. (Pl.'s First Am.

Compl. ¶ 14.) More broadly, Plaintiff alleges that Superintendent Toney oversaw the

"creation and implementation of [Piedmont] policies, procedures, and customs with

regard to the provision of medical care." (*Id.*) Finally, Plaintiff alleges that although the

PRJA established "minimum standards" for Piedmont's "administration and operation," it

"delegated final policymaking authority for the management of the prison" to

Superintendent Toney. (*Id.* at ¶ 13.)

Plaintiff's characterization of Superintendent Toney's authority admittedly borders

on conclusory, and thus need not be accepted as true. *See Iqbal*, 129 S. Ct. at 1949 ("A

pleading that offers labels and conclusions or a formulaic recitation of the elements of a

cause of action will not do.") (internal quotations and citations omitted). Nonetheless, at

this stage in the litigation, the Court can reasonably infer that, as the highest-ranking

officer at Piedmont, Superintendent Toney's acts and edicts constituted official policy.

For that reason, the Court attributes to him both individually and in his official capacity,

and thus also to the PRJA, the policy and custom of deliberate indifference which

Plaintiff has plausibly alleged Superintendent Toney promulgated and maintained at

43

Piedmont.  At least at this stage, therefore, Defendants' Motion will be denied as to the PRJA and Superintendent Toney, in his individual capacity, in Count One.

    *b.  Superintendent Toney's § 1983 Supervisory Liability*

    Defendants also move to dismiss Count Two, in which Plaintiff alleges that Superintendent Toney is liable as a supervisory official for his indifference toward, and tacit authorization of, the "systematic" denial of medical care at Piedmont. Superintendent Toney argues that he cannot be held vicariously liable under § 1983 for the misconduct of his subordinates.

    Under § 1983, a plaintiff "must plead that each Government-official defendant, though the official's own actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948. A supervisory official is not automatically liable for the misconduct of his employees under principles of *respondeat superior*. *Monell*, 436 U.S. at 694; *see also Iqbal*, 129 S. Ct. at 1948 (rejecting that "a supervisor's mere knowledge of his subordinate's [unconstitutional conduct] amounts to the supervisor's violating the Constitution"). In certain instances, however, supervisory officials may be liable for "constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Specifically, a supervisory official's "continued inaction in the face of widespread abuses ... provides an independent basis for finding he was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." *Slaken*, 737 F.2d at 372.

    In the Fourth Circuit, a plaintiff seeking to establish supervisory liability under § 1983 must show: (1) that "the supervisor had actual or constructive knowledge that his

subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) that the supervisor's response was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there existed "an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799 (internal citations omitted).  In short, a plaintiff must demonstrate that the supervisor's constitutionally offensive inaction was itself a "direct cause" of the injury alleged, *Miltier*, 896 F.2d at 854—a heavy burden.[14]

To satisfy the first prong of *Shaw*, Plaintiff must allege that Superintendent Toney had actual or constructive knowledge that the behavior of Piedmont personnel posed a pervasive and unreasonable risk of constitutional harm.  Misconduct is "pervasive and unreasonable" if it is "widespread."  *Randall v. Prince George's Cnty.*, 302 F.3d 188 206 (4th Cir. 2002).  Importantly, Plaintiff need only show that Superintendent Toney was aware of the risk posed to "citizens *like*" Newbrough, *Shaw*, 13 F.3d at 799 (emphasis added)—not that he was specifically aware of the circumstances surrounding Newbrough's particular course of treatment.

For the reasons discussed in *Section III.D.2.a.ii* above, the numerous public investigations and media coverage reporting the poor quality of Piedmont's health

---

[14] Arguably, *Iqbal* may have abrogated supervisory liability altogether. *See Iqbal*, 129 S. Ct. at 1957 (Souter, J., dissenting) ("Lest there be any mistake, ... the majority is not narrowing the scope of supervisory liability; it is eliminating *Bivens* supervisory liability entirely. The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects."). Because a *Bivens* action "is the federal analog to suits brought against state officials under ... § 1983," *id.* at 1948, the Court's reasoning may effectively nullify supervisory liability in both § 1983 actions and *Bivens* actions.

services sufficiently evidence an alleged widespread practice of inadequate detainee care. Of course, Superintendent Toney may prove that he had no knowledge of his subordinates' pattern of misconduct.[15] In considering merely the plausibility of Plaintiff's claims, however, it is reasonable to conclude that Piedmont's highest ranking official, even if newly hired, was aware of the substantial shortcomings in his facility's medical care, especially as documented in government and news reports.

Second, Plaintiff must show that Superintendent Toney's response, in light of this knowledge, was so inadequate as to amount to supervisory indifference or tacit authorization of his staff's misdeeds. Defendants contend that Superintendent Toney reasonably relied upon the expertise of his medical staff. (PRJA Mem. Supp. at 14.) As a 12(b)(6) motion tests only the legal sufficiency of a plaintiff's complaint, and not the weight of the evidence, such an argument is premature. To avoid dismissal, Plaintiff need only allege such inaction on the part of Superintendent Toney as to support a reasonable inference of deliberate indifference.

The First Amended Complaint sets forth facts from which the Court can reasonably infer that, at least in the three years preceding Newbrough's death, a pattern of deficient detainee medical care persisted under Superintendent Toney's administration. Defendants may ultimately prove that such a practice endured *despite* affirmative steps by Superintendent Toney to ensure adequate detainee health services, rather than *because*

---

[15] Defendants' emphasis on the lack of any allegation that the reports stemming from these investigations "ever made it to Superintendent Toney" (PRJA Mem. Supp. at 8) is premature, as is their assertion that the public and news reports were issued prior to Superintendent Toney's tenure. These contentions do not render Plaintiff's claims implausible.

*of* his deliberate inaction.  At this stage, however, Plaintiff has stated a plausible claim of supervisory indifference.

Finally, a plaintiff may establish causation "by [the] tort principle that holds a person liable for the natural consequences of his actions." *Shaw*, 13 F.3d at 799.  In *Section III.D.2.a.iii*, this Court found the facts before it to establish at least a plausible causal nexus between the alleged practice at Piedmont of rendering inadequate medical care and Newbrough's death.  For the same reasons, it is also reasonable to conclude, at this juncture, that the deprivation of Newbrough's rights was a natural and foreseeable consequence of Superintendent Toney's alleged approval of, or indifference toward, that broad practice.

It remains open to Superintendent Toney to prove that he was unaware of the risk that Piedmont's medical program posed to detainee health, *Farmer*, 511 U.S. at 830, or that he responded reasonably.  But, given the facts alleged, these issues cannot properly be resolved on a motion to dismiss.  For that reason, Defendants' Motion will be denied as to Count Two.

## E.

In deciding whether to grant a motion to stay proceedings in a case, a district court must "exercise [its] judgment to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket." *U.S. v. Georgia Pac. Corp.*, 562 F.2d 294, 296 (4th Cir. 1977) (citing *Landis v. N. Amer. Co.*, 299 U.S. 248, 254 (1936)).  To justify its request, the moving party "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair

possibility that the stay for which he prays will work damage to someone else." *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983).

Plaintiff requests that the Court stay proceedings as to all claims against the United States until October 15, 2011, or until DOJ releases a forthcoming report on the provision of medical care at Piedmont. In support of its Motion, Plaintiff contends that the DOJ report will "narrow the issues involved in this lawsuit [and] potentially facilitate out-of-court resolution of the lawsuit." (Pl.'s Mem. Supp. Mot. Stay 2.) The United States consents to a temporary stay pending the resolution of any motions to dismiss, but objects to a full stay of proceedings. Further, the United States approximates that the DOJ report may not be issued until mid-2012. (Def. U.S.'s Opp'n 2 n.1.) On balance, the Court finds neither a preliminary or full stay to be appropriate in this case.

Because the Court agrees with the United States that the contents of the DOJ report will not alter the determination of threshold legal issues (*id.* at 2), including the sufficiency of Plaintiff's factual allegations, the Court need not impose a stay as to preliminary dispositive motions. And as this Memorandum Opinion disposes of all currently pending motions to dismiss, the concession of the United States that discovery might be stayed during the pendency of such motions is moot.

Plaintiff also has not identified grounds justifying a complete stay. First, Plaintiff's equivocal assertions that the DOJ report will "likely help" streamline this litigation, and that it will "potentially facilitate" settlement do not evidence "clear and convincing circumstances" in favor of the stay. *Williford*, 715 F.2d at 127. Second,

Plaintiff has not alleged that it will endure any undue hardship or inequity in the absence

of a stay. And third, the representation by the United States that the DOJ report may not

be released for nearly a full year militates against delaying the progress of this litigation.

Accordingly, the Court will deny Plaintiff's Motion to Stay. However, should the DOJ

report be released during the pendency of this litigation, and if appropriate at that time,

Plaintiff may renew its Motion to Stay.

## IV.  CONCLUSION

For the reasons stated above, the Medical Defendants' Motion to Dismiss will be

granted as to Plaintiff's claims in Count Four against Defendants Johnson, K. Toney, and

Wise. That Motion will be denied as to Defendants Scott and Dr. Gordon. The Motion

to Dismiss filed by the PRJA and Superintendent Toney will be granted as to Counts

Three and Four, as well as the official-capacity claim against Superintendent Toney in

Count One. That Motion will be denied as to Count Two and as to Plaintiff's claims in

Count One against the PRJA and Superintendent Toney in his individual capacity.

In sum, the following Counts and parties remain: Count One, against the PRJA

and Superintendent Toney in his individual capacity; Count Two, against Superintendent

Toney in his official and individual capacities; Count Four, against Defendants Scott,

Cambridge, Randolph, Dr. Gordon, and Sgt. Tillerson; and Counts Five through Eight, as

alleged in the First Amended Complaint.

Additionally, Plaintiff's Motion to Stay will be denied.

An appropriate Order will accompany this Memorandum Opinion.

_____ /s/ _____
Henry E. Hudson
United States District Judge

Date: Sept 28, 2011
Richmond, VA