IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

FILED JAN 18 2012 CLERK, U.S. DISTRICT COURT RICHMOND, VA

JACK NEWBROUGH, Administer of )
the Estate of Guido Newbrough, Deceased, )
)
    Plaintiff, )
)
v. ) Civil Action No. 3:10CV867-HEH
)
PIEDMONT REGIONAL JAIL )
AUTHORITY, *et al.*, )
)
    Defendants. )

## MEMORANDUM OPINION
(Granting Defendant's Motion for Judgment on the Pleadings)

This is a civil rights and wrongful death action filed by Jack Newbrough ("Plaintiff"), Administer of the Estate of Guido Newbrough ("Newbrough"), against the Piedmont Regional Jail Authority ("PRJA") and various employees thereof; several unknown U.S. Immigration and Customs Enforcement ("ICE") agents; and the United States of America. It is presently before the Court on the United States' Motion for Judgment on the Pleadings. For the reasons set forth herein, the Motion will be granted.

### I. BACKGROUND

The facts of this case are detailed in the Court's Memorandum Order of September 28, 2011 (Dk. No. 50), so they will not be fully restated here. Newbrough, a German national, was arrested on February 19, 2008 and ordered to appear before a Department of Justice immigration judge. After being deemed removable in late July, ICE agents (the

"ICE Defendants") designated Newbrough to Piedmont Regional Jail ("Piedmont") pending deportation, pursuant to an Intergovernmental Agreement with the facility.

While at Piedmont, Newbrough developed numerous skin lesions and sores on his scalp. Those wounds allegedly went untreated. In late October, he began to exhibit symptoms consistent with a serious staph infection, including back pain, frequent urination, dizziness, and fatigue. In addition, medical assessments revealed an elevated heart rate and high blood pressure. As his condition worsened, Newbrough allegedly had difficulty standing and walking, and his pain frequently kept him from sleeping. Despite making repeated verbal requests for assistance, however, Newbrough purportedly received only minimal medical attention. In some instances, Plaintiff alleges that Newbrough was physically abused by Piedmont correctional staff. Federal agents were not directly involved in the day-to-day provision of medical care at the facility.

On November 27, 2008, only hours after being removed from the jail's medical observation unit, Newbrough was found unresponsive in his cell. He was transported to a nearby hospital, where he died the following day. Doctors at the hospital confirmed that Newbrough had suffered a heart attack as a result of a bacterial infection in his heart valves. A later autopsy also revealed that his death might have been avoided with proper medical treatment in the preceding weeks.

In light of the foregoing, Plaintiff filed suit in this Court. His First Amended Complaint asserts three claims relevant to the Motion at hand.[1] In Count VI, Plaintiff

---

[1] Plaintiff's First Amended Complaint also asserted numerous claims against Piedmont employees, some of which the Court dismissed in its Order of September 28, 2011.

alleges that the ICE Defendants violated Newbrough's rights under the Fifth Amendment to the U.S. Constitution by placing him at Piedmont without ensuring proper medical screening and despite knowledge that Piedmont "routinely denied adequate medical care" to detainees. In support of his claim that agents "knew or reasonably should have known that Piedmont was likely to inflict constitutional injury on ... Newbrough," (Pl.'s Mem. Opp. 11), Plaintiff identifies a number of reports documenting "the pattern of mistreatment of immigration detainees at Piedmont." (Pl.'s Compl. ¶ 27.) Counts VII and VIII assert state-law tort claims against the United States for wrongful death and intentional infliction of emotional distress ("IIED"), respectively, under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*

On October 12, 2011, the United States filed the immediate Motion pursuant to Rules 12(c), 12(b)(1), and 12(h)(3), contending that this Court lacks subject matter jurisdiction over Plaintiff's FTCA claims.

## II. STANDARD OF REVIEW

While the defense of "lack of subject-matter jurisdiction" generally "must be made before pleading," Fed. R. Civ. P. 12(b), the court "must dismiss" a claim if it "determines *at any time* that it lacks subject-matter jurisdiction." Fed. R. Civ. P. 12(h)(3) (emphasis added). Accordingly, "questions of subject matter jurisdiction may be raised at any point during the proceedings." *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004). Indeed, even "[a]fter the pleadings are closed," a party may assert such a jurisdictional challenge by moving for "judgment on the pleadings." Fed. R. Civ. P. 12(c).

"[I]f a party raises an issue of subject matter jurisdiction on his motion for judgment on the pleadings, the court will treat the motion as if it had been brought under Rule 12(b)(1)." 5A Wright & Miller, Federal Practice and Procedure § 1367 (1990). Thus, the plaintiff bears the burden of proving that subject matter jurisdiction exists. *See Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). This is especially so in an action against the federal government, "because the party who sues the United States bears the burden of pointing to ... an unequivocal waiver of immunity." *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (quotation marks and citation omitted). Further, in determining whether jurisdiction exists, the court may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Williams*, 50 F.3d at 304 ("Indeed, the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.").

### III. ANALYSIS

Although the United States is generally immune from suit, the FTCA "represents a limited congressional waiver of sovereign immunity for injury or loss caused by the negligent or wrongful act of a Government employee acting within the scope of his or her employment." *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994). However, there are numerous exceptions to the FTCA's waiver of immunity, the "most important" of which is the so-called "discretionary function exception" set forth in 28 U.S.C. § 2680(a). *McMellon v. United States*, 387 F.3d 329, 335 (4th Cir. 2004) (en banc), *cert. denied*, 544 U.S. 974 (2005). If

one of these exceptions applies, "the proper practice is dismissal for want of jurisdiction." *Hodge v. United States*, 443 F. Supp. 2d 795, 797 (E.D. Va. 2006). The Court must "strictly construe[]" the FTCA and resolve "all ambiguities ... in favor of the sovereign." *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996).

In this case, the United States argues that the discretionary function exception bars Plaintiff's negligence and IIED claims (Counts VII and VIII). Under § 2680(a) of the FTCA, the United States has not waived its sovereign immunity as to "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). As the Supreme Court has explained, this exception aims "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort[,] [and] ... to protect the Government from liability that would seriously handicap efficient government operations." *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984) (quoting *United States v. Muniz*, 374 U.S. 150, 163 (1963)).

To determine whether conduct falls within the ambit of the discretionary function exception, courts apply the two-step inquiry prescribed in *Berkovitz v. United States*, 486 U.S. 531 (1988). Under that framework, the court first asks "whether the governmental action complained of 'involves an element of judgment or choice.'" *Baum v. United States*, 986 F.2d 716, 720 (4th Cir. 1993) (quoting *Berkovitz*, 486 U.S. at 536). If the conduct at issue is subject to any federal statute, regulation, policy, or constitutional

5

mandate "prescribing a specific course of action ... then the conduct involves no legitimate element of judgment or choice," *id.*, because "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. In such instances, "the function in question cannot be said to be discretionary," *Baum*, 986 F.2d at 720, and the discretionary function exception will not insulate the United States from liability.

If no such directive applies, then the court must determine whether the exercise of judgment at hand is one "based on considerations of public policy." *Id.* (quoting *Berkovitz*, 486 U.S. at 531). This second prong "focuses not on the agent's subjective intent in exercising the discretion, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Suter v. United States*, 441 F.3d 306, 311 (4th Cir. 2006) (citation and quotation marks omitted). Accordingly, the court must examine "the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which ... would inherently ... be grounded in considerations of policy." *Baum*, 986 F.2d at 721. Moreover, when a statute, regulation, or agency guideline vests an official with discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991).

### A. First Prong: The Element of Decision or Choice

Turning to the immediate facts, this Court must first determine whether the decision by ICE to utilize Piedmont for Newbrough's pre-removal detention involved an element of judgment or choice. As to this first prong, Plaintiff advances two arguments that would render the discretionary function bar inapplicable to his FTCA claims. First,

6

Plaintiff asserts that the decision to house Newbrough at Piedmont was inconsistent with federal regulations. Second, he contends that the designation violated clear constitutional mandates. As to this latter argument, Plaintiff claims that ICE officials took steps which they *reasonably should have known* would *cause others*—namely, Piedmont personnel—to violate Newbrough's right to constitutionally sufficient medical attention. The Court will evaluate both of Plaintiff's arguments, in turn.

### *1. Federal Regulations*

As the United States concedes, ICE's discretion to decide where to house pre-removal detainees is "limited" by two federal regulations. The first provides, in pertinent part, that the United States "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," including non-federal facilities that are "adapted or suitably located for rental." 8 U.S.C. § 1231(g). The other regulatory provision further clarifies that "[u]nder no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage[:] ... (1) 24-Hour supervision, (2) Conformance with safety and emergency codes, (3) Food service, and (4) Availability of emergency medical care." 8 C.F.R. § 235.3(e).

Although these regulations certainly *cabin* ICE's discretion to decide where to designate detainees, they leave the agency ample room for judgment: ICE remains free to choose among any number of detention facilities that comport with the threshold parameters established by 8 U.S.C. § 1231(g) and 8 C.F.R. § 235.3(e). Where such a statute or regulation imposes only a general duty on a federal agency, the discretionary

function exception may still apply if the agency retains sufficient discretion in carrying out that duty. *See Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998).

Indeed, most courts to address the issue have agreed that detainee designation and classification decisions, even if guided by internal policy, fall squarely within the discretionary function exception. *See, e.g., Patel v. United States*, 398 Fed. App'x 22, 29 (5th Cir. 2010) ("[D]ecisions regarding the transfers and classification of prisoners generally fall within the discretionary function exception."); *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003); *Cohen v. United States*, 151 F.3d 1338, 1343-44 (11th Cir. 1998); *Saunders v. United States*, 502 F. Supp. 2d 493, 496 (E.D. Va. 2007) (finding that federal regulations "do[] not limit or guide" the discretion of the U.S. Marshals Service to "select[] which non-federal facilities will house federal prisoners ... so long as the space is adequate, suitable, and meets minimum compliance criteria"); *Branch v. United States*, No. 2:05cv423, 2006 WL 1770995, at *3 (E.D. Va. June 22, 2006) (holding that BOP's statutory obligation to "provide suitable living quarters and provide for the safekeeping, care, and subsistence" of criminal defendants "imposes a general duty to care for persons held by the BOP, but does not set forth any specific means of carrying out that duty"). The only remaining question, therefore, is whether ICE's particular exercise of its discretion in this case exceeded even the outer bounds of these regulatory provisions.

Plaintiff argues that, as of 2008, Piedmont failed to meet the minimum standards set forth in 8 C.F.R. § 235.3(e), such that ICE lacked the discretion to house Newbrough there. Specifically, Plaintiff contends that the facility failed to conform to safety and

8

emergency codes and to make emergency medical care available. This assertion finds no support in the record, however, and the allegations contained in Plaintiff's First Amended Complaint, even if true, do not support such a conclusion.

Rather, the evidence indicates that ICE placed Newbrough at Piedmont pursuant to a standing Intergovernmental Agreement (IGA) with the facility. Under Article XIII of the IGA, Piedmont agreed to provide certain "mandatory minimum conditions of confinement ... during the entire period of the IGA agreement," including 24-hour supervision and surveillance by "[a]dequate, trained jail staff"; three meals per day; 24-hour "emergency medical care"; maintenance of an automatic smoke detection and alarm system; and maintenance of adequate water supply and waste disposal systems. (DeSanti Decl. 9.) In short, Piedmont assured the United States that federal detainees would be housed in a § 235.3(e)-compliant facility.

Further, there is no evidence in the record that, prior to Newbrough's designation, ICE agents knew Piedmont to be in breach of its contractual obligations. To the contrary, the United States has submitted the declarations of two ICE officials who would testify that Piedmont was in compliance with the requirements of 8 C.F.R. § 235.3(e) at the time of Newbrough's detention. (*Id.* at ¶ 14; Brooks Decl. ¶¶ 7-9.) And though ICE found in 2006 that "the medical health care unit [at Piedmont] [did] not meet minimum ICE standards" (Pl.'s Am. Compl. at ¶ 28), the failure of a facility to comply with the agency's internal, *non-mandatory* National Detention Standards in no way "limit[ed] the discretion of ICE officials in deciding whether to utilize, or to continue utilizing, a particular IGA facility to house immigration detainees." (Brooks Decl. at ¶ 5.)

9

Although the provisions relied upon by Plaintiff undoubtedly demarcate the outer limits of ICE's discretion, Plaintiff has neither alleged facts nor supplied evidence showing that agents "in fact failed to ... adhere to [such] mandatory standard[s]." *Baum*, 986 F.2d at 720. Accordingly, the United States may be shielded by the discretionary function exception. *See Gaubert*, 499 U.S. at 324 ("If a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation.") (citation omitted).

### 2. *The Fifth Amendment to the U.S. Constitution*

Turning to Plaintiff's next argument, the Court's analysis begins with the proposition that "federal officials do not possess discretion to violate constitutional rights." *Medina*, 259 F.3d at 225 (citations omitted). As Plaintiff correctly asserts, the discretionary function exception will not shelter the United States from liability if the allegations in the Amended Complaint support a plausible claim that ICE agents violated Newbrough's constitutional rights. If, however, Plaintiff has not alleged a plausible constitutional claim against any individual federal agents, then the Court need only conduct a straightforward analysis employing the two-factor *Berkovitz* framework. *See id.* at 226 (concluding that actions "authorized and implemented consistent with federal law and the Constitution of the United States[] may be considered discretionary functions ... even if they would otherwise constitute actionable torts under state law").

Plaintiff's claim depends upon the "principle of effective causation by indirect means," whereby an official may be held liable not "for conduct that directly violates a

10

right," but rather "for conduct that is the effective cause of another's direct infliction of ... constitutional injury." *Sales v. Grant*, 158 F.3d 768, 776 (4th Cir. 1998). Under that theory, the "requisite causal connection can be established ... by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* (quoting *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 560-61 (1st Cir. 1989)). If proven, such knowing disregard "reflects deliberate indifference to the risk that a violation of a *particular* constitutional ... right will follow the decision." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). Accordingly, the relevant inquiry in this case is "whether it was reasonably foreseeable" that the actions of federal agents would ultimately "lead to the rights violations alleged to have occurred." *Wong v. United States*, 373 F.3d 952, 966 (9th Cir. 2004).

In essence, Plaintiff's argument is that (1) the ICE Defendants knew the quality of medical care at Piedmont to be exceptionally poor, and, therefore (2) ICE should have foreseen that Newbrough's placement at the jail would cause him to suffer constitutional injury. To bolster his claim, Plaintiff directs the Court to numerous reports—of which ICE was allegedly aware—describing the jail's deficient health services. Most notably, Plaintiff cites a December 4, 2006 ICE memorandum which disclosed that "[t]he medical health care unit [at Piedmont] does not meet minimum ICE standards" and that Piedmont "ha[d] failed on multiple levels to perform basic supervision and provide for the safety and welfare of ICE detainees." (Pl.'s Am. Compl. at ¶ 28.) The report further concluded that "[t]he line of communications in the Medical department at [Piedmont] is poor and detainee health care is in jeopardy." (*Id.*)

11

Plaintiff also alleges that, prior to Newbrough's detention, ICE had received several complaints from detainees requesting that the Office of the Inspector General (OIG) at the Department of Homeland Security (DHS) investigate whether detainees were receiving proper medical care at Piedmont. (*Id.* at ¶ 29.) Plaintiff mentions four such requests made between 2005 and 2007. Additionally, the DHS Joint Intake Center in Washington, D.C. purportedly received notice in July 2008 that Piedmont officials had denied thirteen detainee requests for medical attention. (*Id.* at ¶ 31.)

In addition, Plaintiff relies upon a "Report on Observational Tour of Piedmont Regional Jail" compiled by the American Bar Association Delegation to Piedmont Detainee Center and submitted to the Director of ICE's Office of Detention and Removal. (*Id.* at ¶ 30.) Plaintiff alleges that the Delegation visited Piedmont in August 2007 and interviewed both detainees and staff, including the jail's superintendent. The ABA report related one case in which a detainee had submitted four requests for medical care in two months, but had not yet seen a doctor. Moreover, the report noted the complaints of several detainees concerning long waits for medical attention and incomplete responses to their health care requests.

Finally, Plaintiff claims that in the years preceding Newbrough's detention, "the pattern of mistreatment of immigration detainees at Piedmont, including the denial of medical care, had been the subject of prominent news articles by national and local news organizations." (*Id.* at ¶ 27.) In particular, "Piedmont received intense scrutiny from the media and ICE officials following the highly publicized death of Abdeulaye Sall ..., who died at Piedmont in 2006 due to lack of medical treatment." (*Id.*) For example, Plaintiff

points to a 2007 *New York Times* article reporting that Sall "was not given treatment for a serious kidney ailment, even when he was barely able to walk." (*Id.*)

In light of these reports, Plaintiff contends that at the time of Newbrough's designation, the ICE Defendants knew or "should have known that Piedmont did not meet ICE standards for a detention facility, that Piedmont was dangerous for immigrant detainees, and that immigrant detainees did not receive adequate medical attention for their serious medical needs in violation of their constitutional rights." (*Id.* at ¶ 26.) Plaintiff further asserts that the ICE Defendants knew of "the facility's routine denial of medical care to immigrant detainees," but "deliberately chose to maintain [Piedmont] in that condition, continued to place immigrant detainees in the facility, and took no steps to improve medical care at the facility." (*Id.* at ¶ 32.) Such knowing disregard, Plaintiff claims, is constitutionally offensive in its own right.

Plaintiff's argument disregards the distinction between the level of care that the Constitution *commands* and the potentially higher quality of care that an agency might *expect* of its detention facilities. *See Morton v. Arlington Heights Fed. Savings and Loan Assoc.*, 836 F. Supp. 477, 485 (N.D. Ill. 1993) (observing that an agency's own "internal guidelines and directives" may be "more stringent than would constitutionally be required"); *cf. Baires v. United States*, No. C 09-05171, 2011 WL 1743224, at **3-4 (N.D. Cal. May 6, 2011) (finding that the plaintiff failed to "plausibly allege[] the necessary foreseeable harm" where he alleged "that there were 'dozens' of inmate grievances about inadequate medical care" and that "ICE's own inspection reports show[ing] that Lerdo [Pre-trial Detention Facility] was out of compliance with National

Detention Standards"). As an agency official explained in this case, ICE's National Detention Standards are simply internal and aspirational guidelines that facilitate the agency's evaluation of the detention centers with which it contracts. (Brooks Decl. at ¶ 5.) Thus, even if ICE had previously found Piedmont's medical services to fall below *agency* standards, nothing suggests that ICE knew jail conditions to be so poor as to endanger a detainee's right to *constitutionally* adequate care.

Taken even in the light most favorable to Plaintiff, the facts alleged show merely that the decision to house Newbrough at Piedmont may have been negligent. The Court cannot reasonably infer, however, that the ICE Defendants possessed such a depth of knowledge that their actions amounted to conscious disregard of a foreseeable risk of constitutional injury.[2] *Cf. Baires*, 2011 WL 1743224, at *5 ("[T]he Court cannot find that the knowing transfer of HIV positive detainees to a detention facility that has received poor inspection results and has been the subject of dozens of grievances—without more—demonstrates either an excessive risk to detainee safety or that these individual federal defendants in fact knew of that risk."). Because the merely misguided designation of a detainee does not rise to the level of a constitutional violation, Plaintiff has failed to allege a plausible *Bivens* claim.[3]

---

[2] In so holding, the Court does not condone the actual neglect by a federal agency of its duty to ensure proper detainee care. Nor does the Court make any judgment as to whether Newbrough's constitutional rights were violated by any *other* defendants in this matter. To find Plaintiff's claim against the ICE Defendants to be plausible, however, would be to determine that ICE should reasonably have expected *every* detainee housed at Piedmont to suffer constitutional injury at the hands of the facility's personnel. The present allegations do not support such a drastic conclusion.

[3] Because the face of the First Amended Complaint fails to state a claim for relief against the yet-unidentified ICE Defendants, Plaintiff's claim in Count VI will also be dismissed, *sua*

The alleged conduct of federal agents in this case did not violate mandatory federal regulations, binding internal ICE directives, or any constitutional mandate. Rather, the decision to designate Newbrough to Piedmont clearly "involve[d] an element of judgment or choice." *Berkovitz*, 486 U.S. at 536. The Court therefore finds that this case satisfies the first prong of the discretionary function exception test.

## B. Second Prong: Considerations of Public Policy

The second prong of the analysis considers whether the government action at issue is the type of conduct that "would inherently ... be grounded in considerations of policy." *Baum*, 986 F.2d at 721. Importantly, this inquiry turns "not on the agent's subjective intent in exercising the discretion ..., but on the nature of the actions taken and whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Here, having found that federal regulations vest ICE with discretionary judgment to decide where to house detainees, the Court begins with a presumption that the agency's "acts 'are grounded in policy when exercising that discretion." *Bernaldes v. United States*, 81 F.3d 428, 429 (4th Cir. 1996) (quoting *Gaubert*, 499 U.S. at 324). A closer examination of the decision in question confirms the propriety of that presumption.

---

sponte. *See Erline Co. S.A. v. Johnson*, 440 F.3d 648, 655 n.10 (4th Cir. 2006) ("Where the face of a complaint plainly fails to state a claim for relief, a district court has no discretion but to dismiss it.") (citations omitted); *see also Wachtler v. Cnty. of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994) ("The district court has the power to dismiss a complaint sua sponte for failure to state a claim, so long as the plaintiff is given notice and an opportunity to be heard.") (internal citations and quotation marks omitted); *Apostol v. Landau*, 957 F.2d 339, 342-43 ("*Sua sponte* dismissals for failure to state a claim upon which relief may be granted are permitted, provided a sufficient basis for the court's action is apparent from the plaintiff's pleading.").

Here, Plaintiff acknowledged that the present Motion turned, in large part, on the plausibility of the constitutional claim contained in Count VI. Both parties fully briefed that issue. Having now concluded that the First Amended Complaint fails to state a plausible Fifth Amendment claim against the ICE Defendants, dismissal of Count VI is appropriate.

The United States has attached to its memorandum in support of the present Motion the declaration of Jay M. Brooks, Deputy Assistant Director of ICE's Enforcement and Removal Operations department. Mr. Brooks testifies that "in determining which ... facility will be used to house a particular immigration detainee," the agency considers "many factors[,] including available bed space at the jails, proximity to the immigration court for movement to upcoming court appearances, transportation burden, the detainee's medical needs, the daily detainee rates charged by the facility, the availability of the facility to meet any special needs of the detainee, and maintaining the viability of available jail space." (Brooks Decl. at ¶ 6.) Under Fourth Circuit precedent, these considerations are unquestionably grounded in policy.

In selecting a detention center for pre-removal aliens such as Newbrough, "the United States ha[s] to weigh concerns of expense, administration, payment, access to the premises, and a veritable plethora of factors before arriving at the decision to engage" a particular facility. *Williams*, 50 F.3d at 310 (finding the selection of a janitorial and maintenance company for a federal building to fall within the exception). Because it requires the government to balance a host of factors—including cost, detainee safety, proximity to other relevant governmental buildings, facility conditions, and other administrative concerns—the challenged decision in this case "involves exercising judgment based on considerations of policy." *Id.* at 309-10. It is, therefore, "precisely the type of decision that the [discretionary function] exception is designed to shield from

liability."[4] *Id.* at 310. Accordingly, the Court finds that the facts of this case easily meet the second prong of the discretionary function exception analysis.

## IV. CONCLUSION

In any suit against the United States, "it is the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists and that none of the [FTCA's] waiver exceptions apply to his particular claim." *Welch v. United States*, 409 F.3d 646, 650-51 (4th Cir. 2005); *see also Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009) ("Plaintiffs bear the burden of proving that the discretionary function exception does not apply to [their claim]."). Because Plaintiff has not met that burden in this case, his claims against the United States in Counts VII and VIII of the First Amended Complaint "must be dismissed" for lack of subject matter jurisdiction. *Welch*, 409 F.3d at 651.

The Court will also dismiss, *sua sponte*, Plaintiff's Fifth Amendment claim against unknown ICE Defendants, contained in Count VI of the First Amended Complaint.

An appropriate Order will accompany this Memorandum Opinion.

                                                           /s/
                                       Henry E. Hudson
                                       United States District Judge

Date: Jan. 18, 2012
Richmond, VA

---

[4] Other courts have agreed. *See, e.g., Cohen*, 151 F.3d at 1344 ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons."); *Baires*, 2011 WL 1743224, at *7 ("[T]he decision of where to send a detainee is necessarily grounded in social, economic and political policy; employees must weigh numerous factors pertaining to cost, various facilities' capabilities, geography, etc.").